**Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



ATTORNEY FOR APPELLANT:

**KARA REAGAN**
Stafford Law Office, LLC
Bloomington, Indiana

ATTORNEYS FOR APPELLEE:

**ANNA M. SEBREE**
Department of Child Services,
Monroe County Office
Bloomington, Indiana

**ROBERT J. HENKE**
DCS Central Administration
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

IN THE MATTER OF THE INVOLUNTARY )
TERMINATION OF THE PARENT-CHILD )
RELATIONSHIP OF A.B., MINOR CHILD, )
AND HER FATHER, S.M.B., )
)
S.M.B. )
)
    Appellant-Respondent, )
)
      vs. ) No. 53A01-1204-JT-147
)
INDIANA DEPARTMENT OF CHILD )
SERVICES, )
)
    Appellee-Petitioner. )

APPEAL FROM THE MONROE CIRCUIT COURT
The Honorable Stephen R. Galvin, Judge
Cause No. 53C07-1105-JT-417

**October 18, 2012**

**BRADFORD, Judge**

Appellant-Respondent S.M.B. ("Father") appeals the juvenile court's order terminating his parental rights to A.B. Father alleges that the Indiana Department of Child Services ("DCS") did not provide sufficient evidence to support the termination of his parental rights. Concluding that the evidence was sufficient to support the termination of Father's parental rights, we affirm.

## FACTS AND PROCEDURAL HISTORY

A.B. was born on May 21, 2010, at which time she tested positive for both amphetamines and THC. L.F. ("Mother") also tested positive for drugs, specifically, amphetamine, methamphetamine, and marijuana while pregnant. Mother and Father used drugs together while Mother was pregnant. Father did not try to stop Mother from using drugs during her pregnancy. Despite the fact that A.B. tested positive for drugs at the time of her birth, Mother and Father were permitted to take A.B. home from the hospital.

DCS first became involved with A.B. on June 4, 2010, after police were called to Mother and Father's shared residence to investigate an alleged act of domestic violence against Mother by Father. In the course of investigating the alleged domestic incident, police determined that the altercation between Mother and Father began at Wal-Mart and continued into the home. Father was heavily intoxicated and Mother was heavily medicated at the time. Father drove the family home from Wal-Mart while intoxicated. At one point, Mother and Father were engaged in a physical altercation over who would hold A.B., with Mother trying

2

to physically take A.B. out of Father's arms.  While either Mother or Father was holding A.B., Father pushed Mother down the stairs.[1]  Police also found that the home shared by Mother and Father did not meet minimum living standards and contacted DCS.

On June 7, 2010, DCS filed a verified petition alleging that A.B. was a CHINS.  The juvenile court conducted an initial hearing on July 2, 2010, at which it entered a denial on behalf of both Mother and Father.  The juvenile court conducted a fact-finding hearing on the CHINS petition on August 23, 2010, at which Mother appeared and admitted that A.B. was a CHINS.  Father, however, did not appear at the fact-finding hearing.  The juvenile court issued a dispositional order on September 20, 2010, in which it ordered Mother and Father to complete certain services.  The juvenile court conducted a review hearing on December 6, 2010, at which it found that Mother and Father had not complied with A.B.'s case plan, visited regularly with A.B., or cooperated with DCS.  A subsequent review hearing was held on March 7, 2011, at which the juvenile court found that Mother and Father had still not complied with A.B.'s case plan, had not fully cooperated with DCS, and that Mother, but not Father, had participated in visitation with A.B.

On May 25, 2011, DCS filed a petition seeking the termination of Mother's[2] and Father's parental rights to A.B. On December 16, 2011, and January 27, 2012, the juvenile court conducted an evidentiary termination hearing at which Father appeared and was

---

[1] It is unclear who was holding A.B. when Father pushed Mother down the stairs because the petition alleging that A.B. was a Child In Need of Services ("CHINS") indicated that Father was holding A.B. while the juvenile court's order finding A.B. to be a CHINS states that Mother was holding A.B. when Father pushed her down the stairs.

[2] The termination of Mother's parental rights is not at issue in this appeal.  Mother subsequently consented to the termination of her parental rights and the adoption of A.B. by maternal grandmother.

represented by counsel. During the termination hearing, DCS introduced evidence relating to Father's history of domestic and substance abuse, Father's inability or refusal to properly care for his children, and Father's failure to participate in or benefit from the services offered by DCS. DCS also introduced evidence indicating that termination of Father's parental rights was in A.B.'s best interests, and that its plan for the permanent care and treatment of A.B. was adoption. Father presented evidence which he claimed demonstrated that he was beginning to make progress and, as such, should be given more time before his parental rights were terminated. On March 5, 2012, the juvenile court terminated Father's parental rights to A.B. Father now appeals.

## DISCUSSION AND DECISION

The Fourteenth Amendment to the United States Constitution protects the traditional right of a parent to establish a home and raise his child. *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 145 (Ind. 2005). Further, we acknowledge that the parent-child relationship is "one of the most valued relationships of our culture." *Id*. However, although parental rights are of a constitutional dimension, the law allows for the termination of those rights when a parent is unable or unwilling to meet his responsibility as a parent. *In re T.F.*, 743 N.E.2d 766, 773 (Ind. Ct. App. 2001), *trans. denied*. Therefore, parental rights are not absolute and must be subordinated to the child's interests in determining the appropriate disposition of a petition to terminate the parent-child relationship. *Id*.

The purpose of terminating parental rights is not to punish the parent but to protect the child. *Id*. Termination of parental rights is proper where the child's emotional and physical development is threatened. *Id*. The juvenile court need not wait until the child is irreversibly

4

harmed such that her physical, mental, and social development is permanently impaired before terminating the parent-child relationship. *Id*.

Father contends that the evidence presented at the evidentiary hearing was insufficient to support the juvenile court's order terminating his parental rights. In reviewing termination proceedings on appeal, this court will not reweigh the evidence or assess the credibility of the witnesses. *In re Involuntary Termination of Parental Rights of S.P.H*., 806 N.E.2d 874, 879 (Ind. Ct. App. 2004). We only consider the evidence that supports the juvenile court's decision and reasonable inferences drawn therefrom. *Id*. Where, as here, the juvenile court includes findings of fact and conclusions thereon in its order terminating parental rights, our standard of review is two-tiered. *Id*. First, we must determine whether the evidence supports the findings, and, second, whether the findings support the legal conclusions. *Id*.

In deference to the juvenile court's unique position to assess the evidence, we set aside the juvenile court's findings and judgment terminating a parent-child relationship only if they are clearly erroneous. *Id*. A finding of fact is clearly erroneous when there are no facts or inferences drawn therefrom to support it. *Id*. A judgment is clearly erroneous only if the legal conclusions made by the juvenile court are not supported by its findings of fact, or the conclusions do not support the judgment. *Id*.

In order to involuntarily terminate a parent's parental rights, DCS must establish by clear and convincing evidence that:

(A) one (1) of the following exists:
    (i) the child has been removed from the parent for at least six (6) months under a dispositional decree;
    (ii) a court has entered a finding under IC 31-34-21-5.6 that reasonable

5

efforts for family preservation or reunification are not required, including a description of the court's finding, the date of the finding, and the manner in which the finding was made; or

(iii) the child has been removed from the parent and has been under the supervision of a county office of family and children or probation department for at least fifteen (15) months of the most recent twenty-two (22) months, beginning with the date the child is removed from the home as a result of the child being alleged to be a child in need of services or a delinquent child;

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) termination is in the best interests of the child; and

(D) there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2) (2010). Specifically, Father claims that DCS failed to establish that either (1) the conditions that resulted in A.B.'s removal or the reasons for A.B.'s placement outside of his care will not be remedied, or (2) there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of A.B. Father also claims that DCS failed to establish that termination of his parental rights was in A.B.'s best interests.

## A. Conditions Resulting in Removal Not Likely to be Remedied

In arguing that DCS failed to establish by clear and convincing evidence that the conditions resulting in A.B.'s removal from his care will not be remedied and that the continuation of the parent-child relationship poses a threat to A.B., Father acknowledges that because Indiana Code section 31-35-2-4(b)(2)(B) is written in the disjunctive, the juvenile

6

court need only find *either* that the conditions resulting in removal will not be remedied *or* that the continuation of the parent-child relationship poses a threat to A.B. *In re C.C.*, 788 N.E.2d 847, 854 (Ind. Ct. App. 2003), *trans. denied*. Therefore, "where, as here, the [juvenile] court specifically finds that there is a reasonable probability that the conditions which resulted in the removal of the [child] would not be remedied, and there is sufficient evidence in the record supporting the [juvenile] court's conclusion, it is not necessary for [DCS] to prove or for the [juvenile] court to find that the continuation of the parent-child relationship poses a threat to the [child]." *In re S.P.H.*, 806 N.E.2d at 882. In order to determine that the conditions will not be remedied, the juvenile court should first determine what conditions led DCS to place A.B. outside of Father's care, and, second, whether there is a reasonable probability that those conditions will be remedied. *Id*.

When assessing whether a reasonable probability exists that the conditions justifying a child's removal and continued placement outside her parent's care will not be remedied, the juvenile court must judge the parent's fitness to care for his child at the time of the termination hearing, taking into consideration evidence of changed conditions. *In re A.N.J.*, 690 N.E.2d 716, 721 (Ind. Ct. App. 1997). The juvenile court must also evaluate the parent's habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. *Id*. A juvenile court may properly consider evidence of the parent's prior criminal history, drug and alcohol abuse, history of neglect, failure to provide support, and lack of adequate employment and housing. *McBride v. Monroe Cnty. Office of Family & Children*, 798 N.E.2d 185, 199 (Ind. Ct. App. 2003). Moreover, a juvenile court "'can

7

reasonably consider the services offered by [DCS] to the parent and the parent's response to those services.'" *Id.* (quoting *In re A.C.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997)).

Here, the juvenile court found that DCS presented sufficient evidence to prove that the conditions that resulted in A.B.'s removal from Father's care were not likely to be remedied, and upon review, we conclude that the juvenile court's finding to this effect is supported by the record. In support of its conclusion that there is a reasonable probability that the conditions which resulted in A.B.'s removal from Father will not be remedied, the juvenile court made a number of findings which Father now claims are clearly erroneous because the findings are not supported by the evidence.

The juvenile court made the following findings in support of its determination that there was a reasonable probability that the conditions which resulted in A.B.'s removal from Father's care would not be remedied:

> [A.B.] was born with drugs in her system. She was removed from her parents' care on June 4, 2010, due to her parents' inability to provide her with adequate care due to their chronic substance abuse and ongoing pattern of domestic violence. Following the child's removal, neither parent began to take advantage of court-ordered services for almost a year.
>
> [Father] has a history of criminal behavior and substance abuse that spans the entirety of his adult life. He has repeatedly been convicted for criminal offenses relating to his drug and alcohol abuse. With each new conviction, he has been offered substance abuse treatment, including inpatient, outpatient, and relapse prevention services. Without exception, he is [sic] failed to complete the services.
>
> [Father] notes that he has been sober for the last four months and has been doing well in Drug Court. The evidence is clear that he has been making substantial efforts to comply with the requirements of Drug Court and the Court's orders in [A.B.'s] CHINS case. However, as his probation officer notes, we will not know if Drug Court has been effective in changing

8

[Father's] patterns of behavior until [Father] completes the program and is able to maintain sobriety on his own. [Father] cannot complete the Drug Court program until April, 2013. Given his repetitive pattern of failing to complete substance abuse treatment, there is no reasonable probability that he will do so.

Further, [Father] has a history of committing acts of domestic violence. Although he has actively participated in treatment, he steadfastly denies that he has ever engaged in acts of domestic violence. He demonstrates no insight into this problem and no motivation to change.

[Father] has no history of providing adequate care for his children. [A.B.] was in his care for only two weeks before she was removed. During this time, [Father] consistently used drugs and alcohol. He operated a vehicle while intoxicated with [A.B.] in the vehicle. He also engaged in a shoving match with [Mother] while holding the child and pushed [Mother] down the stairs.

[Father] endangered his four-year-old son [S.B.] when [S.B.] was in his care. [Father's] father, [paternal grandfather], is [S.B.'s] current legal Guardian. Despite a court order to the contrary, [paternal grandfather] has been allowing his son to have regular, unsupervised contact with [S.B.] during these visits, [Father] has not demonstrated that he can adequately parent [S.B.] Indeed, as the [Court Appointed Special Advocate ("CASA")] notes, interactions between [Father] and [S.B.] are chaotic. He has no effective approach to disciplining [S.B.] In general, [Father] is not receptive to advice. During visits with [A.B.], [Father] acts more like a babysitter than a parent.

[Father] currently lives in a trailer owned by his brother. He pays no support for his children. He has only recently obtained part-time employment. His sobriety is tenuous at best. [Father] needs a great deal of help and structure just to function adequately. He is not fully capable of caring for *himself* without assistance. He is not remotely ready to assume the responsibility of parenting [A.B.]

Appellant's App. pp. 15-16 (emphasis in original).

In challenging these findings, Father acknowledges that A.B. was born with drugs in her system and was removed from his care for the reasons set forth by the juvenile court. Father also acknowledges that he has a substantial criminal history, anger issues, and a history of substance abuse. Father, however, claims that these facts do not amount to a *prima*

9

*facie* showing that the conditions will not change because the findings do not take into account the positive changes made by Father in the months leading up to the termination hearing. Specifically, Father claims that he has gained sobriety, obtained counseling for his anger issues, and stayed out of trouble while attempting to maintain a relationship with A.B. Father denies that he has a history of domestic violence and argues that, even if he did have a history of domestic violence, he has not engaged in any instances of domestic violence since the initiation of the underlying CHINS case. Father also argues that the juvenile court's finding that he does not have a history of providing adequate care for his children is not supported by the evidence, which he claims shows that he, at the time of the termination hearing, was providing adequate care for his son.

Upon review, we conclude that each of the juvenile court's above-stated findings is supported by the evidence. It is undisputed that A.B. was born with drugs in her system and that she was removed from Mother's and Father's care when she was approximately fourteen days old for the reasons stated by the juvenile court. It is also undisputed that Father had amassed a substantial criminal history and had abused drugs and alcohol for most, if not all, of his adult life.

The record reveals that, despite Father's claim to the contrary, Father did have a history of domestic abuse. At the time of the termination hearing, Father was participating in what he called a "batterers" therapy group. Father claimed that he was nearing completion of this program and that he had learned a lot about how to better control his anger issues. Father, however, steadfastly denied that he had previously engaged in any physical domestic

10

abuse. Tom Sullivan, the therapist that lead this "batterers group" testified that Father had previously admitted to and accepted responsibility for his prior violent domestic acts and seemed to be responding well to the treatment provided during group sessions. Sullivan indicated, however, that Father's refusal to accept responsibility for these acts during the termination hearing was concerning because generally, one is not likely to change prior bad behavior if he has not accepted responsibility for and admitted the wrongfulness of such behavior.

The record further reveals that Father had not shown that he could adequately provide care for A.B. Again, A.B. was removed from Father's care when she was approximately fourteen days old. Father consistently used drugs and alcohol during the fourteen days that A.B. was in his care. On at least one occasion, Father operated a vehicle while intoxicated with A.B. in the vehicle and engaged in violent acts against Mother in A.B.'s presence. In addition, on at least one occasion, Father operated a scooter while intoxicated with A.B.'s half-brother sitting on his lap.

Father had a mixed record with regard to participation in and success with the services offered by DCS and did not appear to be receptive to advice from service providers. Sarah Cahillane, the visitation supervisor assigned to supervise Father's visits with A.B., acknowledged that Father's attendance at visits with A.B. had been more consistent in the months leading up to the termination hearing, but testified that Father had demonstrated a history of erratic attendance at visits with A.B. Cahillane also testified that despite Father's more consistent attendance at visits with A.B., the visits had not progressed to a level where

she could recommend that Father be permitted unsupervised visitation with A.B. Debra Hackman, the CASA assigned to work with A.B., testified that A.B.'s interactions with Father during visits were more akin to a babysitting situation than a parenting situation and that Father had not demonstrated an ability to correct or discipline his son and A.B. during visits. A.B.'s maternal step-grandmother, who also acted as A.B.'s child-care provider, testified that A.B. would act out after returning from visits with Father. These facts support the juvenile court's finding that Father had not demonstrated that he could provide adequate care for A.B.

When considered as a whole, we conclude that the evidence is sufficient to demonstrate a reasonable probability that the conditions which resulted in A.B.'s removal from Father's care will not be remedied. It was within the province of the juvenile court, as the finder of fact, to minimize any contrary evidence of changed conditions in light of its determination that Father's failure to provide a safe, stable, and drug-free living environment which led to A.B.'s removal was unlikely to change. *See In re L.S.*, 717 N.E.2d 204, 210 (Ind. Ct. App. 1999), *trans. denied*.

Furthermore, despite Father's claim to the contrary, the record reveals that the juvenile court's findings do take into account that, at the time of the termination hearing, Father appeared to have made progress and to have been doing well in his current stint in Drug Court,[3] had acquired what appeared to be stable housing, and had acquired lawful part-time

---

[3] Father had only suffered one relapse and two other violations of the Drug Court rules.

employment. The juvenile court, however, found that these improvements came during a period where outside forces had imposed a great deal of structure on Father's conduct, and, as such, it could not consider these recent improvements to be indicative of a permanent lasting change in light of Father's habitual patterns of conduct when the imposed structure was not present.

The juvenile court clearly considered the evidence presented by Father in support of the progress that he appeared to be making, however, it is well-established that the juvenile court, acting as a trier of fact, was not required to believe or assess the same weight to the testimony as Father. *See Thompson v. State*, 804 N.E.2d 1146, 1149 (Ind. 2004); *Marshall v. State*, 621 N.E.2d 308, 320 (Ind. 1993); *Nelson v. State*, 525 N.E.2d 296, 297 (Ind. 1988); *A.S.C. Corp. v. First Nat'l Bank of Elwood*, 241 Ind. 19, 25, 167 N.E.2d 460, 463 (1960); *Haynes v. Brown*, 120 Ind. App. 184, 189, 88 N.E.2d 795, 797 (1949), *trans. denied*. Father's claim effectively amounts to an invitation for this court to reassess witness credibility and reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.

Under these circumstances, we cannot say that the juvenile court erred in determining that DCS established that it is unlikely that the conditions resulting in A.B.'s removal would be remedied. *See In re C.M.*, 675 N.E.2d 1134, 1140 (Ind. Ct. App. 1997). Having concluded that the evidence was sufficient to support the juvenile court's determination, and finding no error by the juvenile court, we need not consider whether the continuation of the

13

parent-child relationship poses a threat to A.B.'s well-being because DCS has satisfied the requirements of Indiana Code section 31-35-2-4(b)(2)(B) by clear and convincing evidence.

## B. A.B.'s Best Interests

Next, we address Father's claim that DCS failed to prove by clear and convincing evidence that termination of his parental rights was in A.B.'s best interests. We are mindful that in determining what is in the best interests of a child, the juvenile court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride*, 798 N.E.2d at 203. In doing so, the juvenile court must subordinate the interests of the parent to those of the child involved. *Id*. Furthermore, this court has previously determined that the testimony of the case worker regarding the child's need for permanency supports a finding that termination is in the children's best interests. *Id*.; see also *Matter of M.B.*, 666 N.E.2d 73, 79 (Ind. Ct. App. 1996), *trans. denied*.

In concluding that the termination of Father's parental rights was in A.B.'s best interests, the juvenile court found as follows:

> [A.B.] lived with her parents for only two weeks before she was removed. She was placed in the home of her maternal grandmother []. She has lived in [maternal grandmother's] home almost all of her life. This is the only home [A.B.] has ever known. She is thriving in this placement.
>
> As noted above, [Father] cannot provide the safe, stable, and permanent home that [A.B.] so desperately needs. [Mother] is incarcerated and cannot care for [A.B.] She has consented to the adoption of [A.B.] by [maternal grandmother].
>
> The options for [A.B.] present a stark contrast: She can spend long years in foster care waiting for her parents to demonstrate that they can care for her, or she can be adopted by a loving, caring grandparent who has demonstrated her commitment to [A.B.] since her birth. Clearly, termination of the parent child

14

relationship is in [A.B.]'s best interests.

Appellant's App. p. 16. Father claims that the juvenile court's analysis of A.B.'s best interests misconstrues the options at hand and is representative of a clearly impermissible basis for finding that termination is in the child's best interests. We disagree.

Here, the testimony establishes that A.B. has a need for permanency and stability and that the termination of Father's parental rights would serve her best interests. DCS Case Manager Mary Deckard testified that she believes that A.B.'s best interests would be served by the termination of Father's parental rights because A.B. has a need for permanency and stability and Father has failed to demonstrate that he is capable of providing A.B. with said permanency and stability or with a home free of substance abuse. In discussing A.B.'s need for permanency and stability, Case Manager Deckard indicated concern that Father would be able to sustain his sobriety and general sense of stability that he claimed to have acquired in the months leading up to the termination hearing after the structure provided by the service providers and the Drug Court was removed in light of Father's habitual pattern of drug abuse, instability, and criminal behavior. Case Manager Deckard testified that Father had not demonstrated an ability to come up with a plan for continued improvements to his conduct without the aid of service providers and the Drug Court telling him what he needed to do next. Case Manager Deckard further testified that maternal grandmother provides A.B. with a sense of stability and emotional support that Father is unable to provide.

In addition, CASA Hackman testified that she believed that termination of Father's parental rights and adoption by maternal grandmother would be A.B.'s best interests. CASA

15

Hackman opined that Father's parental rights should be terminated because A.B. required a sense of safety and security and should know that she will be well cared for, and that Father had failed to prove that he could provide A.B. with the necessary level of stability and care. CASA Hackman further testified that it would be devastating to A.B. to remove her from maternal grandmother's home because the home provides her with the sense of safety and security that she so desperately needs. The juvenile court also heard testimony that A.B. has adjusted very well to life at maternal grandmother's home and maternal grandmother has set up a loving and caring support system for A.B., including maternal grandmother, maternal grandfather, and maternal step-grandmother, that allows A.B. to thrive.

The juvenile court did not have to wait until A.B. was irreversibly harmed such that her physical, mental, and social development was permanently impaired before terminating Father's parental rights. *See In re C.M.*, 675 N.E.2d at 1140. In light of the testimony of Case Manager Deckard and CASA Hackman, considered with the reasonable concerns that, in light of Father's habitual patterns of conduct, Father will be able to maintain his sobriety and a stable living environment once the structure provided by the service providers and the Drug Court are removed, we conclude that the evidence is sufficient to satisfy DCS's burden of proving that termination of Father's parental rights is in A.B.'s best interests. Again, Father's claim to the contrary merely amounts to an invitation for this court to reweigh the evidence, which again, we will not do.[4] *See In re S.P.H.*, 806 N.E.2d at 879.

---

[4] To the extent that Father challenges the sufficiency of the evidence to support certain factual findings made by the juvenile court, including that he had failed to adequately parent his son, that he failed to show adequate concern for exposing A.B. to and infecting A.B. with hepatitis C, and that he failed to establish paternity of A.B., we note that each of these findings is adequately supported by the evidence most favorable to

16

Having concluded that the evidence was sufficient to prove the statutory requirements set forth in Indiana Code section 31-35-2-4(b)(2) by clear and convincing evidence, we affirm the judgment of the juvenile court.

The judgment of the juvenile court is affirmed.

ROBB, C.J., and BAKER, J., concur.

---

the judgment of the juvenile court. As discussed above, the evidence demonstrates that Father has not proven that he can adequately parent his son without substantial assistance from others. In addition, Father has failed to initiate a paternity action concerning A.B. despite being instructed to do so by DCS and has acted in a manner which could unnecessarily expose A.B. to hepatitis C, a disease from which he suffers. Father's challenge to each of these findings amounts to yet another invitation to reweigh the evidence, which, again, we will not do. *See In re S.P.H.*, 806 N.E.2d at 879.